**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DAVID GARBER and ANNETTE GARBER,     ) | |
| ) | |
| Plaintiffs,     ) | |
| ) | No. 17 C 673 |
| v.     ) | |
| ) | Judge Virginia M. Kendall |
| AMAZON.COM, INC. and SHENZHEN     ) | |
| GANGSHEN TECHNOLOGY COMPANY LTD.     ) | |
| ) | |
| Defendants.     ) | |
| ) | |

**<u>Memorandum Opinion and Order</u>**

David and Annette Garber sued Amazon.com, Inc. ("Amazon") and Shenzhen Gangshen

Technology Company Ltd. ("Shenzhen") for property damage to their home caused by a fire

ignited by a defective hoverboard the Garbers purchased through Amazon's online marketplace,

Amazon.com.  Plaintiffs sued in state court alleging one count of strict liability and one count of

negligence.  Amazon removed the case to federal court on the basis of diversity jurisdiction and

now moves for summary judgment on both counts.  For the following reasons, Amazon's Motion

for Summary Judgment [Dkt. 39] is granted.

## I.      STATEMENT OF FACTS

The Court draws the relevant facts from the parties' Local Rule ("LR") 56.1 statements

of undisputed material facts and supporting exhibits: Amazon's Rule 56.1(a) Statement of

Undisputed Material Facts (Dkt. 40), Plaintiffs' Rule 56.1(b) Response Statement of Disputed

Material Facts (Dkt. 42), and Defendant Amazon.com, Inc.'s Reply to Plaintiffs' LR 56.1(b)

Response and Response to Plaintiff's Additional Facts (Dkt. 45).  The facts set forth below are

supported by the record and, except where otherwise noted, are undisputed.

### a. The Parties' Local Rule 56.1 Statements

The Court must begin by addressing the parties' Local Rule 56.1 statements. In many instances, the Garbers dispute or deny Amazon's material facts but fail to cite any evidence in the record supporting their disagreements. (Dkt. 42 ¶¶ 3, 7, 8, 9, 10, 22.) Facts that are denied without evidentiary support are undisputed for purposes of summary judgment. *See* L.R. 56.1(a), (b)(3)(B) (non-movant's disagreements with moving party's facts "shall contain . . . specific references to the affidavits, parts of the record, and other supporting materials relied upon"); *see also Ammons v. Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004) ("[W]here a non-moving party denies a factual allegation by the [moving party], that denial must include a specific reference to the affidavit or other part of the record that supports such a denial"). Federal Rule of Civil Procedure 56(e) similarly provides that if the nonmoving party "fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2). Where the Garbers deny Amazon's facts but do not support their denials with evidentiary support, Amazon's facts are deemed admitted.

In other instances, the Garbers "deny that competent evidence has been submitted to substantiate" Amazon's facts, (Dkt. 42 ¶¶ 8, 11-21), but they offer no evidence beyond this conclusory statement that refutes the admissible facts set forth by the sworn declaration of Damon Jones, Amazon's then-Manager of Product Safety and Recalls (Dkt. 40-1), which Amazon relies on extensively. Competent evidence includes facts set forth by affidavit or declaration. Fed. R. Civ. P. 56(c)(4). As long as a competent declarant makes statements based upon personal knowledge, as Mr. Jones has here, the declaration can support a summary judgment motion. *Hill v. Tangherlini*, 724 F.3d 965, 967-68 (7th Cir. 2013); *see*

*also, e.g.*, *Lance v. Bd. Of Educ. of City of Chi.*, No. 14 C 8709, 2016 WL 4417074, at *4 (N.D. Ill. Aug. 19, 2016) ("Plaintiff calls the Board's declarations 'self-serving,' but be that as it may, these declarations are competent evidence of matters within the personal knowledge of the declarants, and plaintiff has not offered countervailing evidence."). Where the Garbers dispute Amazon's material facts solely on the ground that Amazon's facts are not supported by competent evidence, the Court deems those facts to be admitted. And of course, where the Garbers cite evidence in the record that does not actually controvert Amazon's facts, or respond to Amazon's facts with legal argument, those facts have been deemed admitted as well. *See* L.R. 56.1 (b)(3)(B).

Finally, the Court notes that the Garbers set forth many facts and cite many exhibits in their brief opposing summary judgment that are nowhere to be found in their Local Rule 56.1(b)(3)(C) statement of facts. (*See generally* Dkt. 43 at 1-12; Dkt. 42.) Those facts have been disregarded. On summary judgment, the Court considers facts only if they are presented in a compliant Local Rule 56.1 statement or response. *See Midwest Imps., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (holding that the predecessor to L.R. 56.1(b)(3) is "the only acceptable means of . . . presenting additional facts to the district court"); *see also Thornton v. M7 Aerospace LP*, 796 F.3d 757, 769 (7th Cir. 2015) (a "district court is within its discretion to strictly enforce compliance with its local rules regarding summary-judgment motions . . . including by disregarding evidentiary documents because a required statement of facts was not filed"); *see also, e.g.*, *Perez v. Town of Cicero*, No. 06 C 4981, 2011 WL 4626034, at *2 (N.D. Ill. Sept. 30, 2011) ("Under settled law, facts asserted in a brief but not presented in a Local Rule 56.1 statement are disregarded in resolving a summary judgment motion."); *Byrd-Tolson v. Supervalu, Inc.*, 500 F. Supp. 2d 962, 966 (N.D. Ill. 2007) ("[F]acts are properly presented

through the framework of the Rule 56.1 statements, and not through citation in the briefs to raw record material, as that does not promote a reasoned process to air and evaluate the parties' respective positions concerning either: (a) whether there are disputed material facts in the record; or (b) evidentiary objections concerning such matters").

### b. Facts Not Subject to Genuine Dispute

Amazon operates an online marketplace at www.amazon.com, where users across the world can access the site to view and purchase products offered for sale. (Dkt. 40 ¶¶ 7, 22.) The marketplace is an information service that Amazon provides to facilitate commerce between buyers and sellers. (*Id.* ¶¶ 8, 22.) Amazon sells some of its own products on its marketplace, but more than a million third-party sellers sell their own products through the marketplace. (*Id.* ¶ 9.)

### i. Amazon's Business Solutions Agreement and "A-to-Z Guarantee"

Amazon requires all third-party sellers using its marketplace to assent to its "Amazon Services Business Solutions Agreement" ("BSA"), which Defendant Shenzhen did. (Dkt. 42 ¶ 1.) The BSA requires third-party sellers like Shenzhen to adhere to Amazon's policies covering many aspects of sales on the online marketplace. (*Id.* ¶ 2.)

The BSA requires that third-party sellers "source, offer, sell and fulfill" the products they sell on the online marketplace. (Dkt. 40-1 at 13 § S-2.1.) Third-party sellers must "maintain price parity" between products they sell on the Amazon online marketplace and products they sell through other sales channels by ensuring that the price and offer terms (including shipping charges, rebates, discounts, terms of cancellation, and return and refund policies) are "at least as favorable" for Amazon customers as the "most favorable terms" are for customers of other sales channels. (*Id.* at 14 § S-4.) The BSA also requires third-party sellers to provide Amazon customers with customer service that is "at least as responsive and available and offers at least

the same level of support as the most favorable customer services" offered through third-party sellers' other sales channels. (*Id.*) The way the agreement works in relevant part is as follows:

1) The seller decides what to sell and sources the product from the manufacturer or upstream distributor. The Terms state that the seller will "source, offer, sell and fulfill [its] Seller-Fulfilled Products." (Jones Decl. ¶ 12, Ex. B at § S-2.1)

2.) The seller is "responsible for any non-conformity or defect in, or any public or private recall of, any of [its] Products." (Jones Decl., Ex. B at §S -3.1)

3.) The seller provides the product description displayed to the buyer. Sellers must provide "accurate and complete Required Product Information for each product or service that [it] offer[s] through any Amazon Site and promptly update that information as necessary to ensure it at all times remains accurate and complete." (Jones Decl. ¶12, Ex. B at §S -11)

4.) The seller sets the price.(SF¶ 18; Jones Decl. ¶1 2)

5.) The seller is responsible for ensuring the product is properly packaged and complies with all applicable laws. The seller must "ensure that [its] Materials, [its] Products (including packaging) and [its] offer and subsequent sale of any of the same on any Amazon Site comply with all applicable Laws (including all minimum age, marking and labeling requirements) and do not contain any sexually explicit (except to the extent expressly permitted under [Amazon's] applicable Program Policies), defamatory or obscene materials." (Jones Decl. ¶12, Ex. B at § S-1.1)

6.) Unless the seller participates in the Fulfillment by Amazon program ("FBA"), the seller holds its own inventory. The seller decides the means and price of shipping, packages the product for shipment, and ships the product to the buyer. (The FBA service involves logistics services in which third-party sellers pay to store their inventory in an Amazon fulfillment center. This service is not relevant here because Shenzhen sold and shipped the hoverboard directly to Mrs.Garber.) (Jones Decl. ¶ 12)

7.) The seller offers any warranty of its choosing . Amazon does not warrant third-party products sold on the marketplace. (Jones Decl. ¶12)

8.) Amazon processes payment. It charges the payment instrument designated in the buyer's account, and remits the purchase price to the third-party seller minus the service fees the seller agreed to in the BSA. (Jones Decl. ¶18.)

The BSA requires third-party sellers to comply with Amazon's applicable policies and procedures for packaging, labeling, and shipping products; determining shipping and handling charges; providing order status, shipping, and tracking information; and providing certain tax

information. (*Id.* at 13 § S-1.3; 2.1.) The BSA also requires third-party sellers to communicate with Amazon customers using tools and methods Amazon designates. (*Id.* at 12 § 14.) Amazon's return and refund policies apply to products third-party sellers offer on the online marketplace. (*Id.* at 14 § S-2.2.) Through the BSA, Amazon maintains the right to require third-party sellers to obtain, at their expense, "commercial general, umbrella, or excess liability insurance" naming Amazon and its assignees as additional insureds. (*Id.* at 11 § 9.)

Third-party sales through Amazon's online marketplace are covered by Amazon's "A-to-Z Guarantee" program. (Dkt. 42 ¶ 8.) Amazon's description of the "A-to-Z Guarantee" on its website states that Amazon "guarantee[s] purchases from third party sellers when payment is made via the Amazon.com website . . ." and that "[t]he condition of the item [a customer] buy[s] and its timely delivery are guaranteed under the Amazon A-to-Z Guarantee." (*Id.*; Dkt. 43-3 at 11:11-12:18.)

### ii. The Garbers' Purchase

Defendant Shenzhen was a third-party seller with its principal place of business in China who listed and sold products on Amazon's online marketplace. (Dkt. 40 ¶¶ 3, 10.) Shenzhen entered into and assented to the terms of Amazon's BSA. (Dkt. 42 ¶ 1.) Shenzhen sold products on Amazon's online marketplace under the name "Libert00." (Dkt. 40 ¶ 10.) Amazon earned a sales commission on products Shenzhen sold through the online marketplace. (Dkt. 42 ¶ 5.) The commission was 15% of the costs imposed on the customer for a particular sales transaction. (*Id.*)

On November 6, 2015, Annette Garber purchased a hoverboard through the Amazon online marketplace. (Dkt. 40 ¶ 11.) The order detail documents and final invoice associated with the purchase list that the hoverboard was "sold by" and "fulfilled by" the entity "Libert00,"

a name used by Shenzhen, and that Shenzhen was the "seller of record." (Dkt. 40-1 at 9; Dkt. 40-3 at 6; Dkt. 40 ¶¶ 10, 11.) Amazon processed all the money for the transaction. (Dkt. 42 ¶ 6.) Amazon did not package or label the hoverboard Annette Garber purchased. (Dkt. 40 ¶ 16.) Libert00 shipped the hoverboard to Annette Garber. (*Id.* ¶ 12.)

Amazon did not design, manufacture, inspect, maintain, repair, install, or modify the hoverboard Annette Garber purchased, and never possessed it. (Dkt. 40 ¶¶ 13-15, 17.) Libert00 sourced the hoverboard from the manufacturer or upstream distributors (or assembled it from parts that it sourced), owned the hoverboard, set the price for it, and transferred title to it to Annette Garber. (*Id.* ¶ 18.) Libert00, or others upstream in the distribution chain, decided on the warnings, instructions, packaging, and labeling that came with the hoverboard. (*Id.* ¶ 19.) Amazon made no statements or representations about the hoverboard on the product page through which Annette Garber placed the order, nor did it write or develop the product detail page content for the hoverboard. (*Id.* ¶¶ 20-21).

The Garbers deny that they bought the hoverboard from Shenzhen or Libert00 and assert that they believe they bought it from Amazon, because they purchased it through Amazon's online marketplace at www.amazon.com. (*See* Dkt. 42 ¶ 19.) However, they offer no evidence to support this contention beyond unsubstantiated speculation and subjective belief. (*See id.*)

The Garbers allege that on June 29, 2016, the hoverboard spontaneously self-ignited and started a fire that caused extensive damage to their home. (*See* Dkt. 1-1 at ¶¶ 4,7; Dkt. 43 at 1.) The parties do not dispute that the hoverboard was defective in design, that it self-ignited, or that it damaged the Garbers' home. (Dkt. 42 ¶ 21.)

### iii.    Amazon's 2015 Investigation

Amazon had a product safety team whose job responsibilities included monitoring the media and other sources for dangerous products. (Dkt. 42 ¶ 11.) In the second half of November 2015, Amazon's product safety team began a "deep dive" investigation into the safety of hoverboards following media coverage of hoverboard fires. (*Id.* ¶ 12; Dkt. 43-5 at 118:7-20.) As a result of its investigation, Amazon was concerned that the reports of hoverboard fires and explosions "might be indicative of a safety issue of [hoverboards] across Chinese manufacturing." (*Id.* ¶ 13; Dkt. 43-12.) Amazon was concerned that the entire hoverboard product category was "bad" and that product safety issues were "spread across so many manufacturers, so many brands, [and] so many different components." (*Id.* ¶ 14; Dkt. 43-5 at 135:21-136:5.)

As of December 10, 2015, Amazon believed that a "significant number" of the 245,000 hoverboards purchased through its marketplace in the preceding days were purchased as holiday gifts and were thus not in use yet, but would be soon. (*See id.* ¶ 15; Dkt. 43-5 at 242:10-245:15.) Amazon expected to see more fire, smoke, and overheating-related complaints from hoverboards in the coming days. (*See id.*; Dkt. 43-8 at 310-313.) At a December 10, 2015 meeting, Amazon discussed "contingency planning" and ensuring that it was properly staffed and able to monitor any such reports "coming in after Christmas." (*See id.*, Dkt. 43-5 at 242:24-243:7.) On December 12, 2015, Amazon posted a warning on its website informing customers who had purchased hoverboards of the fire and explosion hazards associated with them. (*Id.* ¶ 16.)

Amazon maintained the right to require third-party sellers to provide proof of compliance with certain design and performance standards before they could list products for sale on the online marketplace. (*See* Dkt. 42 ¶ 9; Dkt. 43-3 at 64:18-65:8.) Beginning sometime in

December 2015, Amazon ceased all listings and sales of hoverboards until third-party sellers showed proof of compliance with various safety and performance standards. (*See id.* ¶ 18.)

On July 6, 2016, the U.S. Consumer Product Safety Commission announced that certain brands and manufacturers were recalling hoverboards due to potential fire hazards. (*See id.* ¶ 17; Dkt. 43-17.) The recall notices listed that the recalled hoverboards were "sold at . . . Amazon.com" and other retailers. (*See id.*)

## II.     LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Ferraro v. Hewlett-Packard Co.*, 721 F.3d 842, 847 (7th Cir. 2015.) The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Id.* To avoid summary judgment, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

## III.     DISCUSSION

The Garbers argue that Amazon and Shenzhen were "co-sellers" of the hoverboard that damaged their home. Based on their co-seller theory, the Garbers argue that Amazon should be strictly liable for selling the hoverboard in an unreasonably dangerous condition (Count I) and that it failed to exercise due care at the time of sale (Count II). (*See* Dkt. 1-1 ¶¶ 5-7, 11-13.) The Garbers' negligence claim is pleaded as one involving the parties' negligence at the time of sale (*see* Dkt. 1-1 at ¶ 11), but in opposition to summary judgment, they argue negligence based on a theory of Amazon's post-sale duty to warn. (*See* Dkt. 43 at 9-12, 18-19.)

Amazon argues that it did not design, manufacture, sell, or touch the hoverboard, but merely provided an online marketplace for third-party sellers like Shenzhen to list and sell their

products. Amazon argues that as an online marketplace provider, it cannot be held liable under Illinois law, either under strict liability or negligence, for defective products sold by third parties. Alternatively, Amazon argues that a provision of the Communications Decency Act, 47 U.S.C. § 230(c)(1), bars the Garbers' claims.

### a.        Strict Liability Claim

The first question before the Court is whether an "online marketplace" like Amazon is subject to strict products liability. State law has not addressed this question, so the Court must predict how the Illinois Supreme Court would resolve the issue. *Cmty. Bank of Trenton v. Schnuck Mkts.*, 887 F.3d 803, 811-12 (7th Cir. 2018). If there are no guiding decisions from the Illinois Supreme Court, this Court "should consult and follow the decisions of intermediate appellate courts to predict how the supreme court would act given the chance, unless there is a convincing reason to predict the state's highest court would disagree." *In re Zimmer, NexGen Knee Implant Prods. Liab. Litig.*, 884 F.3d 746, 751 (7th Cir. 2018) (citation and quotations omitted). Absent "any authority from the relevant state courts, [the federal court] . . . shall examine the reasoning of courts in other jurisdictions addressing the same issue and applying their own law for whatever guidance about the probable direction of state law they may provide." *Id.* (citation omitted).

### i.        Amazon's Role in the Distributive Chain

The Illinois Supreme Court applies the doctrine of strict liability in tort as set out in the Restatement (Second) of Torts ("Section 402A").[1] *Calles v. Scripto-Tokai Corp.*, 864 N.E.2d

---

[1] Restatement (Second) of Torts, Section 402A (1965), provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if:
> > (a) the seller is engaged in the business of selling such a product, and

249, 254 (Ill. 2007); *see also Cassidy v. China Vitamins, LLC*, No. 122873, 2018 WL 5076140, at *6 (Ill. Oct. 18, 2018) (slip op.). "In a products liability action, all persons in the distributive chain are liable for injuries resulting from a defective product, including suppliers, distributors, wholesalers, and retailers." *Hammond v. N. Am. Asbestos Corp.*, 454 N.E.2d 210, 216 (Ill. 1983). Placing liability on these parties is justified in part because "their position in the marketing process enables them to exert pressure on the manufacturer to enhance the safety of the product." *Id.*

Amazon argues that it did not manufacture or sell the defective hoverboard, and instead merely provided the service of its online marketplace to match third-party buyers and sellers, and so it cannot be strictly liable under Illinois law. The Garbers allege generally that Amazon "designed, prepared, manufactured, advertised, marketed, distributed, supplied and/or sold" the hoverboard. (Dkt. 1-1 ¶ 4.) But the Garbers made no specific allegations that Amazon manufactured, supplied, or distributed the hoverboard and provided no facts or evidence to support those contentions, so they cannot proceed on those theories.

That leaves the question of whether Amazon "sold" the hoverboard. Amazon argues that in order to survive summary judgment, the Garbers must create a genuine dispute over whether Amazon was a "seller" of the hoverboard. The Court finds that the Garbers did not create such a dispute and that Amazon did not sell the defective hoverboard. But, as explained further in Section III.a.ii below, that does not end the Court's strict-liability inquiry.

---

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Amazon argues that it is not a seller under Illinois law because Shenzhen, not Amazon, "did all the acts associated with selling." (Dkt. 39-1 at 8.) It is undisputed that Shenzhen sourced the hoverboard from the manufacturer or upstream distributor, owned the hoverboard, developed the content of the product offer, set the price, transferred the title to Annette Garber, and shipped the hoverboard directly to her. (Dkt. 40 ¶¶ 12, 18, 20-21.) It is also undisputed that documents associated with the purchase repeatedly stated that the hoverboard was "sold by" and "fulfilled by" Libert00 or Shenzhen. (Dkt. 40-1 at 9; Dkt. 40-3 at 6; Dkt. 40 ¶¶ 10, 11.)

The Garbers, in turn, argue that Amazon and Shenzhen were "co-sellers" and point to the undisputed facts that Amazon profited from the sale of the hoverboard through a sales commission, that the BSA included a provision requiring third-party sellers to provide Amazon customers with price and sale terms as favorable as those offered in other sales channels (which the Garbers repeatedly characterize as Amazon exercising "price control"), and that the hoverboard was covered by Amazon's A-to-Z Guarantee. (Dkt. 43 at 15-16.) According to the Garbers, Amazon "dominat[es] all aspects of the sales transactions" so that a customer believes they are purchasing a product from Amazon, not a third party. (*Id*. at 3.)

The Illinois courts have not precisely defined what it means to be a "seller" for purposes of strict products liability. Nor does Section 402A. *See Crowe v. Public Bldg. Comm'n of Chi.*, 383 N.E.2d 951, 952 (Ill. 1978) (Section 402A does not "attempt[] to define those commercial transactions which may constitute a sale for purposes of attaching strict liability…"). Under Illinois law, a sale "consists in the passing of title from the seller to the buyer for a price." 810 ILCS 5/2-106(1). It is undisputed here that the title to the hoverboard passed directly from Shenzhen to Annette Garber. But the Illinois Supreme Court has never limited its inquiry of whether a party is a "seller" for strict liability purposes solely to the transfer of title.

In *Hammond*, the Illinois Supreme Court briefly addressed the question. 454 N.E.2d at 216-17. There, the defendant was a wholly-owned subsidiary of a British asbestos producer and was incorporated to be a contact point for the British company's North American customers. The defendant argued that it was not a "seller" under Section 402A because it never had control over the asbestos and merely served as a broker, facilitating and servicing its British parent company's sales contracts. The Illinois Supreme Court disagreed and found that evidence of the defendant's "role in marketing the asbestos" was sufficient for a jury finding of strict liability. The Court pointed to the facts that the defendant "agreed to sell and deliver" asbestos to a customer and that the defendant represented to the customer that it was the only entity authorized to offer certain types of asbestos produced by its British parent company. *Id.*

Though the Court's analysis of the defendant's role as a "seller" and its "role in marketing" the defective product is brief, it cites two facts supporting its finding—the direct sales agreement between the customer and the defendant and the defendant's statements about exclusivity—that are not present here. The Garbers have not presented any evidence that Amazon purported to be the exclusive seller of Shenzhen hoverboards or that Amazon had an agreement with the Garbers to sell the hoverboard to them. To the contrary, the facts before the Court reveal that Shenzhen, not Amazon, owned the hoverboard, sourced it and listed it for sale on Amazon's marketplace, and sold and shipped it directly to the Garbers. That is not the sort of relationship the Supreme Court considered when extending strict liability to the defendant as a "seller" in *Hammond*. It is true that the defendant in *Hammond*, like Amazon here, earned a commission for sales of the defective product. But the Illinois Supreme Court did not mention the sales commission in its analysis of whether the defendant was a "seller," so this Court does not find that fact to be determinative on this issue.

A more recent decision of an Illinois appellate court is also instructive. In *Graham v. Bostrom Seating, Inc.*, 921 N.E.2d 302, 307-08 (Ill. App. Ct. 2010), the appellate court considered whether a defendant who purchased and sold a truck with an allegedly defective seat could be held strictly liable as a member of the distributive chain. The defendant argued that its role in the sale "was clerical and passive," like that of an escrow agent or title service, and that because it was merely a "paper shuffler" and "facilitator" of the sale, and never possessed the truck, it was not a "true seller" and could not be held strictly liable as part of the distributive chain. *Id.* at 304. The appellate court rejected that argument, citing paperwork listing the defendant as a purchaser of the truck and then a later invoice listing the defendant as a seller of the same truck to the plaintiff's employer. *Id.* at 307. The court held that this evidence alone created a question of material fact about whether the defendant participated in the distributive chain.[2] *Id.* The Garbers have not presented any sales paperwork listing Amazon as a purchaser or seller of the defective hoverboard. The comparable documents in the record here clearly list that the hoverboard was "sold by" and "fulfilled by" Libert00 and that Shenzhen was the "seller of record." (Dkt. 40-1 at 9; Dkt. 40-3 at 6; Dkt. 40 ¶¶ 10, 11.)

Finally, both parties cite *Alvarez v. Koby Machinery Co.*, Ltd, 516 N.E.2d 930 (Ill. App. Ct. 1987) as supportive of their respective positions regarding Amazon's role in the distributive chain. In *Alvarez*, the plaintiff's employer was in the market for a mill. A manufacturer's representative attempted to sell the employer a new mill and the employer declined, indicating that it wanted to buy a particular brand of used mill instead. The representative did not sell that particular brand but learned of such a mill for sale by another party and alerted the employer to

---

[2] The *Graham* court also found that "it appear[ed]" that the defendant would be strictly liable under a plain reading of Section 402A, because it was undisputed that the defendant sold the truck to the plaintiff's employer and that it reached the employer "without a substantial change in the condition in which it was sold." *Id.* at 308. The court's remaining analysis under Section 402A regarding whether the defendant "was engaged in the business of selling trucks" is not relevant here.

the sale. The representative agreed to travel to the mill and inspect its gearbox for the employer but was not compensated for its inspection or its travel expenses. The representative made no recommendations to the employer regarding modifications to make, did not participate in the sale negotiations, and received no compensation in connection with the sale. The plaintiff was eventually injured by the mill. The court found that the representative's "major role was to inform [the employer] that the mill was for sale, and no courts to date have found this remote role to be sufficient basis for imposing strict liability." *Id.* at 933. The court also cited the fact that the representative "received no consideration for the role he played in bringing [the employer] together with the seller" of the used mill. *Id.*

Amazon argues that it was like the representative in *Alvarez*—a service provider who merely "connected a buyer and seller." (Dkt. 39-1 at 9.) It also claims that, along those lines, it is like "a patent licensor, a consultant, an independent engineering firm, an independent testing laboratory, a law firm, or [ ] a transportation company or independent warehouse," who "conceivably have some relation with the manufacture and sale of the product, but their relationship is peripheral and not directly related to the distributive process." *Id.* (quoting *Mech. Rubber & Supply Co. v. Caterpillar Tractor Co.*, 399 N.E.2d 722, 723-24 (Ill. App. Ct. 1980)). Such service providers generally are not subject to strict products liability. *Mech. Rubber & Supply*, 399 N.E. 2d at 723-24. Amazon is clearly not as far removed from the sale as those kinds of service providers. It did not provide a peripheral service or consult on one discrete aspect of the sale or product—the sale took place entirely through its online marketplace. And unlike the representative in *Alvarez*, Amazon did profit from the sale of the hoverboard through a sales commission.

That said, for purposes of whether the Illinois Supreme Court would find that Amazon was a "seller" of the hoverboard or otherwise part of the distributive chain, the Court finds that Amazon is closer to the *Alvarez* end of the spectrum than it is to *Hammond* or *Graham*. In the latter two cases, Illinois courts pointed to evidence that the defendants made direct sales of defective products and that records of the sales reflected as much. There is no evidence like that here. Though Amazon did earn a commission from the hoverboard sale, its "major role" was providing a venue and marketplace for third-party sellers like Shenzhen to connect with buyers like the Garbers. That level of participation is more like the role of the representative in *Alvarez*, which is not sufficient to support a finding of strict liability. Based on the instructive precedent available to the Court in *Hammond*, *Graham*, and *Alvarez*, the Court predicts that the Illinois Supreme Court would find that Amazon was not part of the hoverboard's distributive chain.

### ii. Amazon's Liability Beyond the Distributive Chain

Though the Court predicts that the Illinois Supreme Court would find that Amazon was not a "seller" of the hoverboard or otherwise within the distributive chain, that does not end the inquiry. In some instances, the Illinois Supreme Court has extended strict liability beyond the distributive chain. *Connelly v. Uniroyal*, Inc., 389 N.E.2d 155, 163 (Ill. 1979). Parties who are not within the chain of distribution but who nonetheless "play an integral role in the marketing enterprise of an allegedly defective product and participate in the profits derived from placing the product into the stream of commerce" may also be held strictly liable. *Bittler v. White & Co.*, Inc., 560 N.E.2d 979, 981 (Ill. App. Ct. 1990) (citing *Connelly*, 389 N.E.2d 155).

The Illinois Supreme Court explained that extending strict liability to such parties is justified because "the loss caused by unsafe products should be borne by those who create the risk of harm by participating in the manufacture, marketing and distribution of unsafe products;

who derive economic benefit from placing them in the stream of commerce, and who are in a position to eliminate the unsafe character of the product and prevent the loss." *Hebel v. Sherman Equip.*, 442 N.E.2d 199, 204-05 (Ill. 1982). "Strict liability arises, not because of the defendant's legal relationship with the manufacturer or with other entities in the manufacturing-marketing system, but because of its 'participatory connection, for [its] personal profit or other benefit, with the injury-producing product and with the enterprise that created consumer demand for and reliance upon the product.'" *Id.* (quoting *Kasel v. Remington Arms*, 24 Cal. App. 3d 711, 725 (Cal. Ct. App. 1972).

The Court's next task is to determine whether the Illinois Supreme Court would find that Amazon, though not a "seller" of the defective hoverboard or otherwise within the distributive chain, should still be held strictly liable because it (1) participated in the manufacture, marketing and distribution of an unsafe product, (2) derived economic benefit from placing the unsafe product in the stream of commerce, and (3) was in a position to eliminate the unsafe character of the product and prevent the loss. *See Hebel*, 442 N.E.2d at 204-05

There is little evidence in the record, if any, to support a finding that the first policy factor cited in *Hebel*—participation in the manufacture, marketing, and distribution of an unsafe product—applies here. It is undisputed that Amazon did not manufacture the hoverboard. (Dkt. 40 ¶ 14.) It is also undisputed that Amazon did not make any statements or representations about the hoverboard on the product page, nor did it develop and of the product detail page content, nor did it play any role in the packaging or labeling of the hoverboard. (*Id.* ¶¶ 19-21.) The Garbers have not directed the Court to any evidence that Amazon otherwise played a role in marketing the hoverboard. The Garbers similarly have not pointed to any evidence that Amazon "distributed" the hoverboard—indeed, it is undisputed that Libert00 shipped it directly to the

Garbers, that Amazon never owned or possessed it, and that title passed directly from Libert00 to Annette Garber. (*Id.* ¶¶ 12, 18.) The second *Hebel* policy factor—deriving an economic benefit from placing the unsafe product in the stream of commerce—cuts against Amazon. It is undisputed that Amazon earned a sales commission from the sale of the hoverboard. (Dkt. 42 ¶ 5.) But the Garbers fail on the third factor as well. The facts that Amazon had the right to require third-party sellers to meet certain safety requirements in order to list their products on the marketplace (*see* Dkt. 42 ¶ 9), and that Amazon stopped allowing third-party sellers to list hoverboards on the marketplace in December 2015 unless they showed proof of compliance with safety standards (*id.* ¶ 18), do not establish that Amazon "was in a position to eliminate the unsafe character" of the product. More than one million third-party sellers offer products on Amazon's marketplace (Dkt. 40 ¶ 9), and Amazon cannot be expected to judge the quality of every product for sale by third parties.

Because the Garbers cannot establish each of the policy factors articulated in *Hebel*, the Court predicts that the Illinois Supreme Court would not extend strict liability to Amazon as a marketplace provider outside of the distributive chain. *See Joiner v. Ryder System, Inc.*, 966 F. Supp. 1478, 1489 n. 24 (C.D. Ill. 1996) ("[I]n *Hebel*, the Illinois Supreme Court listed the factors in the *conjunctive*, [ ] implying that *all* factors were required before liability would be imposed") (emphasis in original) (citation omitted). In *Hebel*, the Illinois Supreme Court similarly declined to extend strict liability beyond the distributive chain in part because the defendant lacked the requisite "participatory connection with the enterprise that produced and marketed" the defective product. 442 N.E.2d at 205. The *Hebel* Court also noted that its previous holding in *Connelly*, where it first established that strict liability could extend beyond the distributive chain, was a narrow one, limited to situations where defendants outside the chain are "*so integrally involved*

in the overall producing and marketing enterprise that strict liability will follow." *Id.* (citing *Connelly*, 389 N.E.2d 155) (emphasis added).

Decisions of the Illinois appellate courts applying *Hebel* are also instructive. In *Bittler v. White & Co.*, 560 N.E.2d 979, 982 (Ill. App. Ct. 1990), a Commonwealth Edison worker who was struck on the head and injured by a piece of trucking equipment sued the equipment manufacturer and the manufacturer's exclusive sales representative for northern Illinois and Indiana. The sales representative moved for summary judgment and argued that it was not part of the distributive chain, and thus not subject to strict liability, because it merely acted as a liaison between the "manufacturer/seller" and the buyer. The Illinois appellate court rejected this argument and held that the sales representative, regardless of its role within the distributive chain, was strictly liable because it was bound by an exclusive sales contract with the manufacturer to promote the sale of the manufacturer's products and because it derived an economic benefit from the relationship through commissions from the manufacturer's sales made in its territory. The court explained that the sales representative's exclusive sales relationship and economic benefit made its "participatory connection" with the defective equipment sufficient for the application of the strict liability. *Id.* at 982 (citing *Hebel*, 442 N.E.2d at 205). Though Amazon did derive an economic benefit from Shenzhen's sale of the hoverboard, the record here reflects nothing like the exclusive sales relationship the court cited in *Bittler* to support the application of strict liability.

In predicting that the Illinois Supreme Court would not find Amazon strictly liable for defective products sold by third-party sellers on its online marketplace, the Court notes that when it is "given a choice between an interpretation of Illinois law which reasonably restricts liability, and one which greatly expands liability, [it] should choose the narrower and more reasonable

path (at least until the Illinois Supreme Court [says] differently)." *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir.1994) (en banc); *see also Insolia v. Philip Morris Inc.*, 216 F.3d 596, 607 (7th Cir. 2000). ("Federal courts are loathe to fiddle around with state law. Though district courts may try to determine how the state courts would rule on an unclear area of state law, district courts are encouraged to dismiss actions based on novel state law claims."); *Home Valu, Inc. v. Pep Boys*, 213 F.3d 960, 965 (7th Cir. 2000) (adopting an interpretation of state law which, between two possible options, "take[s] the approach that is restrictive of liability").

Finally, the Court notes that every other court to consider the question of Amazon's liability has concluded that Amazon is not liable for defective products sold on its marketplace. *See Carpenter v. Amazon.com, Inc.*, No. 17 C 3221, 2019 WL 1259158, at *4-6 (N.D. Cal. March 19, 2019) (applying California law); *Stiner v. Amazon.com, Inc.*, No 17CA11215, 2019 WL 757822 (Ohio Ct. App. Feb. 19, 2019) (applying Ohio law); *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 397-400 (S.D.N.Y 2018) (applying New York law); *Allstate N.J. Ins. Co. v Amazon.com, Inc.*, No. 17 C 2738, 2018 WL 3546197, at *5-12 (D.N.J. July 24, 2018) (applying New Jersey law); *Fox v. Amazon.com, Inc.*, No. 16 C 3013, 2018 WL 2431628, at *8 (M.D. Tenn. May 30, 2018) (applying Tennessee law); *Erie Ins. Co v. Amazon.com Inc.*, No 16 C 2679, 2018 WL 3046243, at *1-3 (D. Md. Jan. 22, 2018) (applying Maryland law); *Oberdorf v. Amazon.com, Inc.*, 295 F. Supp. 3d 496, 599-501 (M.D. Pa. 2017) (applying Pennsylvania law); *see also Milo & Gabby LLC v. Amazon.com, Inc.*, 693 F. App'x 879, 885 (Fed. Cir. 2017) (holding that Amazon is not a "seller" under the Copyright Act, 17 U.S.C. § 106). To the extent the Illinois Supreme Court would consider the laws and judicial opinions of other jurisdictions, "it would encounter an emerging consensus against construing Amazon as a 'seller' or

'distributor'—and, therefore, against holding Amazon strictly liable for defective products sold its on its website." *Eberhart*, 325 F. Supp. 3d at 400.

The Garbers have failed to create a genuine issue of fact on their strict liability claim and Amazon is entitled to judgment as a matter of law.

### b.    Negligence Claim

The Garbers also bring a negligence claim.  Their complaint alleges generally that Amazon and Shenzhen: (a) failed to reasonably inspect the hoverboard; (b) negligently "maintained, repaired, installed, and modified" the hoverboard; (c) negligently failed to warn about the "dangerous propensities" of the hoverboard; (d) negligently failed to discover that the hoverboard was defective; (e) negligently designed the hoverboard; and (f) negligently manufactured the hoverboard.  (Dkt. 1-1 ¶ 11 (a)-(f).)  The Garbers allege that, because of those acts or omissions by Amazon and Shenzhen, the hoverboard was unreasonably dangerous at the time it left the manufacturer's control.  (*Id.* at ¶ 11.)

In their brief opposing summary judgment, the Garbers devote just two paragraphs and cite a single case to support their negligence claim, which they argue "stems from [Amazon's] continuing duty to warn and voluntary undertaking."  (Dkt. 43 at 18-19.)  Amazon takes issue with the fact that the Garbers' complaint focused on a "time-of-sale" negligence claim, and argues that because they "did not plead any post-sale duty-to-warn theory," their negligence claim is doomed.  (Dkt. 44 at 5.)  But "plaintiffs are not required to plead specific legal theories." *Avila v. CitiMortgage, Inc.*, 801 F.3d 777, 783 (7th Cir. 2015).  As long as a plaintiff "plead[s] facts sufficient to state a plausible claim for relief," he is "within his rights in developing his case further through discovery and defending his claim with those facts at the summary judgment

stage." *Grede v. UBS Securities, LLC*, 303 F. Supp. 3d 638, 657 (N.D. Ill. 2018). It is the next step—defending their claims with facts at summary judgment—where the Garbers fall short.

"A product liability action asserting a claim based on negligence . . . is based upon fundamental concepts of common law negligence. As in any negligence action, a plaintiff must establish the existence of a duty, a breach of that duty, and injury that was proximately caused by the duty, and damages." *Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1153-54 (Ill. 2011). The Garbers fail to establish that Amazon owed them any duty, which is fatal to their negligence claim.

The Garbers first argue that Amazon had a continuing duty to warn. They rely on *Jablonski*, which recognizes such a duty in situations where "a design defect is present at the time of sale." 955 N.E.2d at 1159. In those cases, a "*manufacturer* has a duty to a take reasonable steps to warn at least the purchaser of the risk as soon as the manufacturer learns or should have learned of the risk created by its fault." *Id.* (emphasis added.) "Nevertheless, a manufacturer is under no duty to issue postsale warnings or to retrofit its products to remedy defects first discovered after a product has left its control." *Id.* First, the duty to warn recognized in *Jablonski* is clearly limited to manufacturers. The Garbers do not acknowledge this limitation or otherwise try to argue why the duty to warn should extend to Amazon, who did not manufacture the hoverboard. Second, even if a continuing duty did extend to Amazon, the Garbers present no evidence to support their contention that the design defect was present at the time of sale or any evidence about when the Amazon discovered the defect. It is undisputed that the hoverboard was defective (*see* Dkt. 42 ¶ 21), but the Garbers have presented no evidence beyond that to support a continuing duty to warn.

The Garbers also argue that Amazon voluntarily undertook a duty to warn. "Under a voluntary undertaking theory of liability, the duty of care to be imposed upon a defendant is limited to the extent of the undertaking." *Jablonski*, 955 N.E.2d at 1163. "The theory is narrowly construed." *Id.* According to the Garbers, "Amazon voluntarily undertook the responsibility to warn its customers including the Garbers about what it knew and the results of its investigation and specifically the risks of fire and explosion of the hoverboards," and failed to do so reasonably. (Dkt. 43 at 19.) The Garbers do not actually cite a single fact in the record to support this assertion and do not otherwise offer any evidence that Amazon voluntarily undertook a duty to warn them or other customers, or that Amazon did so unreasonably. Conclusory claims without evidentiary support cannot create a triable issue of fact. The Garbers have not established that Amazon owed them a duty, which is a necessary element of their negligence claim. Amazon is entitled to judgment as a matter of law.

## IV. CONCLUSION

Because Amazon is entitled to judgment as a matter of law on the Garbers' claims, the Court need not reach the immunity provision in the Communications Decency Act. For the reasons stated here, Amazon's motion for summary judgment [Dkt. 39] is granted.

Virginia M. Kendall
United States District Judge

Date: March 31, 2019